**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**GOULD, INC., Switchgear Division, Respondent.**

**No. 79–1025.**

United States Court of Appeals, Tenth Circuit.

Argued May 7, 1980.

Decided Oct. 7, 1980.

Rehearing Denied Dec. 18, 1980.

Paul J. Spielberg, Washington, D. C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Sandra Shands Elligers, Atty., N. L. R. B., Washington, D. C., with him on brief), for petitioner.

Richard L. Barnes, of Kothe, Nichols & Wolfe, Inc., Tulsa, Okl., for respondent.

Before BARRETT, PECK* and SEYMOUR, Circuit Judges.

SEYMOUR, Circuit Judge.

This case is before the court on the petition of the National Labor Relations Board for enforcement of its order against Gould, Inc. The Board found that Gould violated section 8(a)(1) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), by discharging two Union officials, Virginia Beekman and Clifford Edgar, for participating in a sympathy walkout. The walkout was prompted by the Gould employees' refusal to cross an informational picket line directed against Houchin Electric, a nonunion contractor performing remodeling work on Gould's premises. The Board found that the picketing was lawful primary activity and that the Gould employees' sympathy walkout in support of the picket line was concerted activity protected by sections 7 and 8(a)(1) of the Act. 29 U.S.C. §§ 157, 158(a)(1). We agree.

Gould's manufacturing employees are represented at its Tulsa, Oklahoma plant by the manufacturing division of the International Brotherhood of Electrical Workers Local Union 584 (the Union). At the time of the walkout, the Company and the Union

were bound by a collective bargaining contract which included a grievance procedure leading to arbitration. In addition, the contract contained the following general no-strike clause (Article XXII), which is linked to the grievance–arbitration machinery:

"*In view of the procedure for the orderly settlement of grievances* provided under the terms of this Agreement, *the Union agrees that there will be no strike,* work interference, or other work stoppage or slowdown of work, total or partial, during the term of this Agreement.

"*An employee or employees who participate in any such action in violation of this Agreement may be disciplined or discharged* from the Company's service, subject to the employee's right to submit a grievance alleging improper discharge in accordance with the provisions of Article XX, Section 3, paragraph (c) of this Agreement."

Rec., vol. II, at 237 (emphasis added).

In addition to the manufacturing division, the Union has two other autonomous divisions, construction and maintenance. The informational picket which triggered the walkout was set up by the Union on behalf of its construction division as part of its two–year campaign to organize the employees of electrical construction contractors. The picket sign contained the word "Information", and warned readers that Houchin Electric Company did not have an agreement with Local 584.

When Beekman, the Shop Steward for Gould's manufacturing employees, became aware of the picketing at around 9:30 a. m. on March 1, 1977, she telephoned Union Business Manager Stroufe to inquire about it. Stroufe informed her that Houchin Electric, a nonunion construction contractor, was working in the plant. He stated that the picketing was directed at Houchin and was purely informational. He emphasized that it was not related to any violation by Gould of the collective bargaining contract covering the plant employees. He said he could not advise her or the other

* Of the United States Court of Appeals, Sixth Circuit, sitting by designation.

employees what to do and that any actions by the employees were "up to each individual, what they decide to do." Rec., vol. I, at 28.

During the morning break, Clifford Edgar called the attention of his fellow employees so that Beekman could relate what she had learned about the picketing. Beekman explained to the group what Stroufe had told her and advised the employees that "whatever action was taken it would be up to each individual, how they felt about what was going on." Rec., vol. I, at 33. Subsequently most of the employees walked out.

That afternoon the company sent a telegram to Stroufe and the employees in the bargaining unit, asserting that the strike not only violated the no–strike clause in the collective bargaining agreement but was an unlawful secondary boycott. The employees were warned that if they did not return to work the next day, they would be discharged.

Before Stroufe received the telegram, Jeff Ott, the employee representative on the second shift, called to inquire what to do. Stroufe told him to proceed with his second shift duties and the second shift went to work as scheduled. Ellis finally called Stroufe late that afternoon to discuss the morning walkout. Stroufe told Ellis he did not feel the contract had been violated "because Article 22 of the contract between IBEW and Gould pertained to the orderly settlement of grievances" and "there was no grievable offense that prompted the picket or the activity that followed." Rec., vol. I, at 114.

The next day all the first shift employees returned to the plant and all except Beekman and Edgar were put back to work without discipline. Beekman and Edgar received suspension letters pending an inves-

tigation into their roles in what the Company termed an "illegal wildcat strike." Rec., vol. II, at 244. On March 10, Gould terminated them, stating they had led the walkout and violated the no–strike clause.

The Union filed unfair labor practices charges against Gould. It also filed grievances on behalf of the two discharged employees, which ended in arbitration prior to the unfair labor practice hearing. In his award, the arbitrator ignored the Union's contention that a no–strike clause such as Article XXII does not constitute a waiver of the right to engage in sympathy strikes. He simply assumed without explanation that the walkout violated Article XXII and focused his attention on the appropriate penalty. The arbitrator found the penalty of discharge to be excessive and reduced the discharges to sixty–day suspensions. The Company refused to comply with the arbitration award, asserting that the arbitrator was without authority to tamper with the penalty.

Notwithstanding its refusal to obey the arbitration award, Gould urges on appeal that the Board erred in failing to defer to the arbitrator's finding that the sympathy walkout violated the no–strike clause. In addition, Gould contends the sympathy walkout did not constitute protected concerted activity and, even if it did, the Union waived its right to engage in sympathy strikes by having agreed to the no–strike clause. We find these contentions without merit and affirm the Board's decision.

## I.

Sections 7 and 8(a)(1) of the Act[1] protect the rights of employees to engage in "concerted activities ... for mutual aid or protection." 29 U.S.C. § 157. The threshold question here is whether the Gould employ-

---

[1]. Section 7 provides in pertinent part:

"Employees shall have the right to self–organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection ...."

29 U.S.C. § 157. Section 8(a)(1) provides that it "shall be an unfair practice for an employer ... to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Section 7 ...." 29 U.S.C. § 158(a)(1).

ees' refusal to cross their fellow union members' picket line was protected under sections 7 and 8(a)(1).

■ An employee has a statutory right to honor any lawful picket line set up against his employer at his employer's place of business, *Delaware Coca–Cola Bottling Co. v. Teamsters Local 326*, 624 F.2d 1182, 104 L.R.R.M. 2776 (3d Cir. 1980), even though the employee is not a member of the picketing union. *See, e. g., NLRB v. Difco Laboratories, Inc.*, 427 F.2d 170, 171–72 (6th Cir. 1970), *cert. denied*, 400 U.S. 833, 91 S.Ct. 66, 27 L.Ed.2d 65 (1970); *NLRB v. Southern Greyhound Lines*, 426 F.2d 1299, 1301 (5th Cir. 1970). Furthermore, an employee's refusal to cross a lawful picket line directed at a *stranger* employer at such employer's place of business is protected, *Teamsters Local 657 v. NLRB*, 429 F.2d 204 (D.C. Cir. 1970), even though the picket line is established by a stranger union. *NLRB v. Alamo Express, Inc.*, 430 F.2d 1032 (5th Cir. 1970), *cert. denied*, 400 U.S. 1021, 91 S.Ct. 584, 27 L.Ed.2d 633 (1971).

■ Today, we must decide whether an employee has the right to honor the lawful picket line of his own union which is set up at his employer's place of business but is directed at a stranger employer doing work on the premises.[2] To deny this right "would be to hold that, although Congress protected the fundamental right of labor organizations to engage in primary picketing, it withheld this protection from the normal employee response which makes this right effective." *West Coast Casket Co.*, 97 N.L.R.B. 820, 823 (1951), *enf'd*, 205 F.2d 902 (9th Cir. 1953). As the Fourth Circuit pointed out: "It cannot be denied that respect for the integrity of the picket line may well be the source of strength of the whole collective bargaining process in which every union member has a legitimate and protected economic interest." *NLRB v. Union Carbide Corp.*, 440 F.2d 54, 56 (4th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971). Consequently, we hold that the Gould employees' refusal to cross the picket line is protected concerted activity under section 7.[3]

2. On appeal, Gould also argues that the picketing itself was unlawful. Earlier it filed separate charges against the Union alleging that the picketing violated sections 8(b)(4) and 8(b)(7)(C) of the Act. 29 U.S.C. §§ 158(b)(4), 158(b)(7)(C). However, after investigating the charges, the Regional Director found them without merit and refused to issue a complaint.
We agree that Gould's argument is without merit. This court has upheld peaceful picketing at the premises of a neutral employer where the record supports a conclusion that the picketing was for informational purposes and not for the purpose of inducing neutral employees to take concerted action against their employer. *NLRB v. International Union of United Brewery Workers*, 272 F.2d 817 (10th Cir. 1959). Here, there is substantial evidence to support the Administrative Law Judge's (ALJ) findings that the walkout was the spontaneous action of the Gould employees and was not directed or induced by the Union within the meaning of section 8(b)(4)(i) of the Act. *Compare Electrical Workers Local 501 v. NLRB*, 341 U.S. 694, 71 S.Ct. 954, 95 L.Ed. 1299 (1951), with *Building & Construction Trades Council (Tampa Sand & Material Co.)*, 132 N.L.R.B. 1564, 1565–66 (1961). Furthermore, there is substantial evidence to support the ALJ's conclusion that the Union made no threat of economic reprisal to force Gould to stop doing

business with the nonunion contractor, as required by section 8(b)(4)(ii). Finally, in view of the evidence that the picketing was intended to inform the public and did not have a substantial disruptive effect, the ALJ properly found it was lawful under section 8(b)(7)(C) of the Act. *See Barker Brothers Corp. v. NLRB*, 328 F.2d 431, 436–37 (9th Cir. 1964).

3. We note, however, that an employee's right to refuse to cross a lawful picket line at his employer's place of business is not unlimited. The employer cannot simply discharge employees for engaging in such protected activity, but the employer may hire permanent replacements for those employees when justified by substantial and legitimate business considerations. *NLRB v. Union Carbide Corp.*, 440 F.2d 54 (4th Cir.), *cert. denied*, 404 U.S. 826, 92 S.Ct. 58, 30 L.Ed.2d 55 (1971); *NLRB v. Southern Greyhound Lines*, 426 F.2d 1299 (5th Cir. 1970). *See generally NLRB v. Fleetwood Trailer Co.*, 389 U.S. 375, 378, 88 S.Ct. 543, 545, 19 L.Ed.2d 614 (1967). For example, in order to continue operations, an employer may replace workers who refuse to cross a picket line. *Union Carbide*, 440 F.2d at 57. *Southern Greyhound Lines*, 426 F.2d at 1301. Gould does not contend here that the discharge of Beekman and Edgar was justified under this doctrine.

Gould, however, argues that the Union waived this protection by agreeing to the no–strike clause contained in Article XXII of the Agreement. The Board disagreed, and "[i]f the Board's interpretation has a reasonable basis in the contract terms, the Act's policies and the Board's expertise, it is entitled to deference." *NLRB v. C. K. Smith & Co.*, 569 F.2d 162, 167 (1st Cir. 1977), *cert. denied*, 436 U.S. 957, 98 S.Ct. 3070, 57 L.Ed.2d 1122 (1978).

■ Although the right to honor picket lines and engage in sympathy strikes may be waived by agreement, *NLRB v. Rockaway News Supply Co.*, 345 U.S. 71, 73 S.Ct. 519, 97 L.Ed. 832 (1952), "clear and unmistakable" language is required to effect such a waiver. *E. g., Delaware Coca–Cola Bottling Co. v. Teamsters Local 326*, 624 F.2d at 1182, 104 L.R.R.M. at 2780; *Newspaper Production Co. v. NLRB*, 503 F.2d 821, 830 (5th Cir. 1974); *Kellogg Co. v. NLRB*, 457 F.2d 519, 525 (6th Cir.), *cert. denied*, 409 U.S. 850, 93 S.Ct. 58, 34 L.Ed.2d 92 (1972). Here, the contract does not expressly prohibit sympathy strikes, and no evidence was presented to suggest the parties intended such a prohibition.[4] Consequently, under the prevailing rules for interpreting general no–strike clauses, we are unable to infer from the language of Article XXII a waiver of the right to engage in sympathy strikes.

■ Moreover, when construing a no–strike clause, we must bear in mind that "a no–strike obligation is the quid pro quo for an undertaking by the employer to submit grievance disputes to the process of arbitration." *Boys Markets, Inc. v. Retail Clerks Local 770*, 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970). Accordingly, "[a]bsent an explicit expression of [another] intention . . . the agreement to arbitrate and the duty not to strike should be construed as having coterminous application." *Gateway Coal Co. v. UMW*, 414 U.S. 368, 382, 94 S.Ct. 629, 639, 38 L.Ed.2d 583 (1974). *See also*

*Delaware Coca–Cola Bottling Co.*, 624 F.2d at 1182, 104 L.R.R.M. at 2779–80. Here Article XXII makes clear that the reach of the no–strike clause is tied to the grievance procedure. It specifies that the no–strike pledge is given "[i]n view of the procedure for the orderly settlement of grievances provided under the terms of this Agreement . . . ." Rec., vol. II, at 237. This language suggests that if the dispute underlying a strike is not subject to the grievance–arbitration machinery of the contract, the strike is not prohibited by the no–strike clause.

Article XX, Section 2 of the contract provides further indication that the grievance–arbitration procedure is intended to resolve only grievances about a claimed "misapplication or violation of a specific provision of [the] agreement . . . ." Rec., vol. II, at 234–35. The parties agree that the dispute underlying the sympathy walkout, *i. e.*, the Union's construction division dispute with Houchin, had nothing to do with the collective bargaining agreement between Gould and the Union's manufacturing division and was, therefore, not arbitrable. Thus, as the Administrative Law Judge pointed out, "[s]ince neither the cause of, nor the issue underlying, the sympathy strike are [*sic*] subject to the settlement procedures of the contract, a ban on the sympathy strike may not be implied." Rec., vol. III, at 667–68. *Accord, Delaware Coca–Cola Bottling Co.*, 624 F.2d 1182, 104 L.R.R.M. 2776; *C. K. Smith & Co.*, 569 F.2d 162; *Hyster Co. v. Independent Towing & Lifting Machine Association*, 519 F.2d 89 (7th Cir. 1975), *cert. denied*, 428 U.S. 910, 96 S.Ct. 3220, 49 L.Ed.2d 1216 (1976).

In *Buffalo Forge Co. v. United Steelworkers*, 428 U.S. 397, 400 n. 2, 96 S.Ct. 3141, 3144 n. 2, 49 L.Ed.2d 1022 (1976), the Supreme Court addressed the related question whether a sympathy walkout may be enjoined when the collective bargaining agreement between the parties contains a

---

4. This case is thus distinguishable from cases where extrinsic evidence was offered to prove that the no–strike clause was intended to prohibit sympathy strikes. *See NLRB v. Rockaway News Supply Co.*, 345 U.S. at 79–80, 73 S.Ct. at 524; *Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters*, 597 F.2d 1138, 1144 (8th Cir.), *cert. denied*, 444 U.S. 840, 100 S.Ct. 79, 62 L.Ed.2d 52 (1979); *News Union v. NLRB*, 393 F.2d 673, 678 (D.C.Cir.1968).

general no–strike clause that does not specifically address sympathy strikes, and an arbitration provision that limits arbitrable disputes to grievances involving "question[s] as to the meaning and application of the provisions of this Agreement." The Court held that the sympathy strike could not be enjoined since

> "the strike was not *over* any dispute between the Union and the employer that was even remotely subject to the arbitration provisions of the contract. The strike at issue was a sympathy strike in support of sister unions negotiating with the employer, neither its causes nor the issues underlying it was subject to the settlement procedures provided by the contracts between the employer and respondents. The strike had neither the purpose nor the effect of denying or evading an obligation to arbitrate or of depriving the employer of his bargain."

*Id.* at 407–408, 96 S.Ct. at 3148.

In *NLRB v. Keller–Crescent Co.*, 538 F.2d 1291, 1296 (7th Cir. 1976), the court read *Buffalo Forge* as suggesting that the employees were contractually bound to arbitrate the legality of a sympathy strike *before* engaging in it. However, *Keller–Crescent* is readily distinguishable from this case. There, a section of the contract dealt specifically with the employees' rights to honor picket lines established by other locals of their own union. The picket line which the employees honored did not fall into the permitted category. Accordingly, the company successfully argued that by expressly permitting one type of sympathetic activity in the contract the parties had manifested an intention to prohibit oth-

er types of sympathetic activities. *See also W–I Canteen Services, Inc. v. NLRB*, 606 F.2d 738, 745–46 (7th Cir. 1979). There is no question that the existence of the picket line clause persuaded the court that the employees had little basis for believing they had the legal right to honor the picket line, and therefore should have arbitrated the question before they refused to cross it.[5] In contrast, the contract here is totally silent on the subject of picket lines. The express link between the no–strike clause and the contractual settlement procedures makes inescapable the inference that only strikes over arbitrable issues were intended to be proscribed.

We hold that the Board properly refused to infer a waiver of the employees' right to engage in sympathetic activity protected by section 7.

## II.

Although Gould refused to comply with the arbitrator's award, which directed that Beekman and Edgar be reinstated after sixty–day suspensions, Gould strenuously argues on appeal that the Board erred in failing to defer to the arbitrator's assumption that Article XXII prohibits sympathy walkouts.[6] We disagree.

Section 10(a) of the Act empowers the Board to prevent unfair labor practices and provides that this power "shall not be affected by any other means of adjustment or prevention that has been or may be established by agreement, law or otherwise ...." 29 U.S.C. § 160(a). Thus, in an unfair labor practice case, the Board is not deprived of jurisdiction to decide an issue

---

5. This conclusion is bolstered by the fact that the court distinguished an earlier Seventh Circuit case, *Gary Hobart Water Corp. v. NLRB*, 511 F.2d 284 (7th Cir.), *cert. denied*, 423 U.S. 925, 96 S.Ct. 269, 46 L.Ed.2d 252 (1975), on the ground that the collective agreement at issue there lacked a picket–line clause. In *Gary Hobart*, it was held that sympathy strikers did not violate a general no–strike clause under essentially the same analysis we have followed here. In *Keller–Crescent Co.*, the court expressly acknowledged the continued vitality of the *Gary Hobart* holding.

6. Gould contends the arbitrator was without authority to modify any penalty imposed by the Company for Article XXII violations. The arbitrator construed the language of Article XXII to allow him to do precisely that. Thus, Gould finds itself in the curious position of arguing that the Board abused its discretion by rejecting the arbitrator's interpretation of Article XXII to prohibit sympathy walkouts, even though Gould itself has steadfastly refused to comply with the arbitrator's award on the ground that he misconstrued another part of the same Article.

which has previously been the subject of an arbitration award. In *Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964) the Court noted:

" 'There is no question that the Board is not precluded from adjudicating unfair labor practice charges even though they might have been the subject of an arbitration proceeding and award. Section 10(a) of the Act expressly makes this plain, and the courts have uniformly so held. However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.' " *Id.* at 271, 84 S.Ct. at 408–09 (quoting *International Harvestor Co.*, 138 N.L.R.B. 923, 925–26 (1962)) (emphasis added).

In the interest of promoting industrial peace and avoiding duplicative litigation, the Board with judicial approval has voluntarily deferred to arbitration awards where the arbitration procedure was "fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act." *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955). *See Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270–71, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964); *NLRB v. Auburn Rubber Co.*, 384 F.2d 1, 3 (10th Cir. 1976). At least two circuits would add two additional requirements to the *Spielberg* test: (1) that the arbitrator *clearly decided* the unfair labor practice issue on which the Board is later urged to give deference and (2) that the arbitrator decided only issues within its competence. *See Stephenson v. NLRB*, 550 F.2d 535, 538 (9th Cir. 1977); *Banyard v. NLRB*, 505 F.2d 342, 347 (D.C. Cir. 1974).

■ The Board has wide discretion in deciding whether deferral to an arbitration award is appropriate under these standards. Upon review, we are limited to the question whether the Board abused its discretion in reaching its deferral decision. *Hawaiian Hauling Service, LTD v. NLRB*, 545 F.2d 674, 676 (9th Cir.), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1976); *NLRB v. Horn & Hardart Co.*, 439 F.2d 674, 679 (2d Cir. 1971). In *NLRB v. Auburn Rubber Co., Inc.*, 384 F.2d at 3, this court said: "[T]he Board has the discretion to defer to, or to reject, the decision of the arbitrator and, in determining whether the discretion has been properly exercised, the tests announced in Spielberg are pertinent." Relying on *Spielberg*, the Board here determined that the arbitrator's decision should not be honored. We find no abuse of discretion in the Board's refusal to defer.

■ Although the Union argued before the arbitrator that sympathy strikes were protected activity and that general no-strike clauses do not automatically effect a waiver of sympathetic rights, the arbitrator failed to address these issues. He assumed without discussion that the sympathy walk-out was "an illegal strike," and devoted his opinion to explaining why Beekman and Edgar could legitimately be singled out for some punishment short of discharge. Rec., vol. II, at 602. As we have previously noted, no extrinsic evidence was presented to the arbitrator to support the conclusion that the parties intended the no-strike clause to cover sympathy strikes.

■ The employees' statutory right to strike lies "at the core" of the Congressional scheme for promoting collective bargaining. *Division 1287, Motor Coach Employees v. Missouri*, 374 U.S. 74, 82, 83 S.Ct. 1657, 1662, 10 L.Ed.2d 763 (1963); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 234–235, 83 S.Ct. 1139, 1149, 10 L.Ed.2d 308 (1963). The Board need not defer to an arbitral decision which is inconsistent with the policies underlying section 7, and which is thereby repugnant to the purposes and policies of the Act. *NLRB v. Owners Maintenance Corp.*, 581 F.2d 44, 48 (2d Cir. 1978); *Dreis & Krump Manufacturing Co., Inc. v. NLRB*, 544 F.2d 320, 330 (7th Cir. 1976).

In particular, where an arbitrator's award clearly ignores a long line of Board and court precedent, the Board's refusal to defer to the award under *Spielberg* is prop-

er. *Alfred M. Lewis, Inc. v. NLRB,* 587 F.2d 403, 407–08 (9th Cir. 1978); *Radio Television Technical School, Inc. v. NLRB,* 488 F.2d 457 (3d Cir. 1973). In this case, the arbitrator assumed that a general no–strike clause *ipso facto* effected a waiver of the right to engage in sympathy strikes, despite the lack of any extrinsic evidence to support that conclusion.[7] Under these circumstances, we conclude the Board properly refused to honor the award as repugnant to the purposes and policies of the Act. *See Dreis & Krump Manufacturing Co. v. NLRB,* 544 F.2d at 330.

ENFORCEMENT GRANTED.

---

**7.** *NLRB v. Pincus Brothers, Inc.,* 620 F.2d 367 (3d Cir. 1980), is distinguishable from this case. There, the arbitrator upheld the discharge of an employee for distributing leaflets containing allegedly false statements about the company. The court held that the Board erred in refusing to defer to the award because "it appears at least arguable that [the employee's] leaflet can be labeled as 'defamatory or insulting material known to be false,' *Linn v. Plant Guard Workers,* 383 U.S. 53, 61, 86 S.Ct. 657, 662, 15 L.Ed.2d 582 (1966), and thus can be character-ized as unprotected under the Act." *Id.* at 376. The court emphasized: "We hold only that where there are two arguable interpretations of an arbitration award, one permissible and one impermissible, the Board must defer to the decision rendered by the arbitrator." *Id.* at 377. Here, the sympathy strike is not even arguably unprotected. As stated above, it is well settled that a general no–strike clause does not operate to waive the right to engage in sympathy strikes absent some extrinsic evidence that the parties so intended.