**ROADWAY EXPRESS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**No. 80–1520.**

United States Court of Appeals, Fourth Circuit.

Argued Jan. 6, 1981.

Decided April 24, 1981.

Frank W. Stegman, Washington, D. C.
(Charles P. O'Connor, Morgan, Lewis &
Bockius, Washington, D. C., Jack F. Cana-
dy, Jack E. Thornton, Jr., Blackwell, Black-
well, Canady & Eller, Winston-Salem, N. C.,
on brief), for petitioner.

Christopher W. Katzenbach, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, John E. Elligers, Washington, D. C., on brief), for respondent.

Before RUSSELL, MURNAGHAN and ERVIN, Circuit Judges.

## DONALD RUSSELL, Circuit Judge:

This matter is before us on the application of the petitioner-employer to review a decision and order of the National Labor Relations Board,[1] and on a cross-application by the Board for enforcement of its order. The issue is whether the Board should have deferred to a voluntary settlement between the petitioner and the employee-grievant Brown of the grievance which later became the basis for the unfair labor practice charge before the Board. The Board in its order refused to defer and proceeded to find the petitioner in violation of the Act. It is that portion of the order refusing to defer which the petitioner basically asks us to review and it is the enforcement of the final order finding the petitioner in violation of the Act which is requested by the Board. We find that the Board improperly refused to defer and accordingly deny enforcement.

Robert Brown, the complainant in the unfair labor practice charge, was a dockworker and union shop steward at the petitioner's Kernersville, North Carolina, terminal. He had been discharged by the petitioner on September 17, 1977, for his alleged participation in an unauthorized strike at the terminal violative of the express no-strike provision in the collective bargaining agreement between the petitioner and the union with which Brown was affiliated and which had collective bargaining rights at the terminal.[2] The day after his discharge, he filed a grievance with his union because of his discharge.[3] The union

1. 246 NLRB No. 28 and 250 NLRB No. 61.

2. The union of which Brown is a member is a party to the National Master Freight Agreement (NMFA), as supplemented. An exposition of the provisions in that Agreement is set forth in *Teamster Local U. No. 30 v. Helms Exp., Inc.*, 591 F.2d 211, 213–14 (3d Cir. 1979).

3. The circumstances of Brown's discharge are as follows: On September 17, 1977, certain workers at the terminal engaged in an unauthorized strike. They set up pickets at the entrance to the plant. The apparent leader was Tommy Allen, though the petitioner concluded that Brown was a co-leader. The terminal manager called the employees still working, including Brown, together and read the terms of the Master Agreement between the employer and the union. This agreement prohibited unauthorized strikes. In particular, it provided for the discharge of any local union officer who participated in an unauthorized strike. *Cf., NLRB v. Armour-Dial, Inc.*, 638 F.2d 51 (8th Cir. 1981). Brown was a local union officer. Because of the strike, the employer ordered all employees on duty to continue working for two additional overtime hours. This was apparently a right of the employer under the contract. Brown refused to do so, claiming he had an engagement to pick up his car at a place where it had been left to be serviced. He left the terminal with another employee, found his car had been returned to his home, and then went to a restaurant where he and his companion purchased a sandwich and coffee for Allen, who was leading the picket line. When the two, Brown and his companion, returned to the terminal they went to the area where the picketing was taking place and, it was their testimony that it was the companion who actually handed Allen the sandwich and coffee. In any event, the employer contended Brown's conduct demonstrated that the claim of another engagement elsewhere was a pretext and that the reason he refused to work and remained about the terminal was that he was involved in the strike as a leader along with Allen, as demonstrated by his mingling with the pickets. The employer asked Brown, as the union steward, to talk to the men and attempt to induce them to return to work. The manager of the terminal took Brown to the picket line in his car for this purpose but Brown requested and was allowed to talk privately with Allen. Whatever was said to Allen by Brown, the fact of the matter is that the picketing was continued. In the meantime, other union representatives arrived and attempted to induce Allen to call the strike off. Allen refused. Finally, as the pickets began falling off, Allen asked to speak to Brown. It was only after Brown talked privately to him that Allen called the strike off. The employer contended, also, that Brown had joined the pickets while the strike was in progress. Brown's conduct throughout the strike was clearly ambiguous. He refused to work because he had another engagement. Yet he shows up a short time after he had

and the petitioner not being able to resolve it, the discharge grievance was submitted for arbitration pursuant to the procedure provided in the Master Agreement. A hearing was had but the local grievance board, which, under the arbitration procedures in the Master Agreement, first considered the grievance, divided 4–4 on the claim. The grievance was then referred to the Eastern Conference Joint Area Committee for resolution, again pursuant to the arbitration procedures in the union agreement.

While the claim was pending for hearing before the Area Committee, Blevins, one of the business agents for the union, who was acting as adviser to Brown in the arbitration, explained to Brown the delay that the hearing before the Committee might occasion and offered to seek to settle the claim with the petitioner if Brown wished him to do so. Brown authorized Blevins, as his representative, to settle, if he could, the grievance with the petitioner. Blevins induced the petitioner to agree to a settlement of the grievance by reinstating Brown without backpay but without any loss of seniority. Brown, upon being advised of the settlement, expressed satisfaction with the agreement. He did, however, request a delay in reporting to work until October 11, 1977 under the settlement. This request of Brown was agreed to by the petitioner.

Blevins wrote a letter on October 11, 1977, to, among others, Brown and the petitioner, confirming the settlement and its terms. In this letter Blevins wrote "[i]t was agreed by all parties that the deadlocked grievance was resolved on the basis that Brother R. B. Brown be reinstated with full seniority and no back pay at his regularly scheduled starting time on Tuesday, October 11, 1977." Neither Brown nor the petitioner disputed the correctness of the settlement as thus detailed by Blevins in his letter. Brown returned to work on October 11 under the terms of the agree-ment as memorialized in Blevins' letter and has worked continuously since.

On February 21, 1978, some four and a half months after the settlement agreement, Brown filed an unfair labor practice charge based on his discharge. Brown contended that he had not authorized the union, through Blevins, to settle his grievance on a no-backpay basis. The petitioner in turn urged the settlement as a basis for a dismissal of the charge. After a hearing at which the parties, with witnesses, were fully heard, the Administrative Law Judge entered his decision, finding that deferral was appropriate under established Board policy and ordered the proceedings dismissed. That decision of the Administrative Law Judge was appealed by the General Counsel, and the Board, by a sharply divided vote reflected in four separate opinions, reversed, finding that the settlement did not qualify for deferral under established Board policy. It remanded the proceedings to the Administrative Law Judge to resolve the unfair labor practice charge. After a hearing on remand on the charge itself, the Administrative Law Judge found for the employer and the Board reversed. This appeal followed. We find it necessary on this appeal to consider only whether deferral in favor of the voluntary settlement was properly denied by the Board under its settled deferral policy. If deferral was inappropriate, enforcement of the Board's order would be proper but, if deferral was authorized under Board policy, enforcement should be denied, since the proceedings should have been dismissed.

 It is recognized by the parties that the Board is not obligated by statute to defer proceedings under the Act in favor of a voluntary settlement of the underlying issue in a Labor Board charge. But it is equally well settled that the Board does have discretion to defer in such a case,[4] and

_____

refused to work with food for the leader of the strike and, according to the employer, was on the picket line. This was the basis for the discharge.

4. *See Carey v. Westinghouse Corp.*, 375 U.S. 261, 271, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964):

"'There is no question that the Board is not precluded from adjudicating unfair labor

when the Board has exercised that discretion to establish a policy of deferral under clearly articulated criteria, whether by formal rulemaking or by adjudicative proceedings, it must adhere to that policy as so established in subsequent decisions or explain the reason for its departure.[5] This, of course, does not mean that an administrative agency such as the Board may not change or abandon these criteria as fixed in its precedents or rules but it does mean, as one court has aptly put it, that "the Board may not depart sub silentio, from its usual rules of decision to reach a different, unexplained result in a single case . . . 'there may not be a rule for Monday, another for Tuesday, a rule for general application, but denied outright in a specific case.'" *N. L. R. B. v. International Union of Operating Eng., Local 925*, 460 F.2d 589, 604 (5th Cir. 1972).[6] *See to the same effect: Contractors Transport Corp. v. United States*, 537 F.2d 1160, 1162 (4th Cir. 1976) (". . . the grounds for an agency's disparate treatment of similarly situated applicants must be reasonably discernible from its report and order"); *Squaw Transit Co. v. United States*, 574 F.2d 492, 496 (10th Cir. 1978) (". . . we surely must require the agency to adhere to its own pronouncements, or explain its departure from them"): *N. L. R. B. v. Silver Bay L. U. No. 962, etc.*, 498 F.2d 26, 29 (9th Cir. 1974) ("The Supreme Court has recently made clear that the Board may announce new principles in an adjudicative proceeding [citing authority]. We agree with the Fifth Circuit, however, that '[n]evertheless, the Board may not depart, sub silentio, from its usual rules of decision to reach a different unexplained result in a single case.'"); *Columbia Broadcasting System, Inc. v. F. C. C.*, 454 F.2d 1018, 1026 (D.C.Cir. 1971) (". . . when an agency decides to reverse its course, it must provide an opinion or analysis indicating that the standard is being changed and not ignored, and assuming that it is faithful and not indifferent to the rule of the law . . . ."). The Board has concededly enunciated under its discretionary power a policy of deferral in favor of both arbitration awards and voluntary settlements when certain criteria are met. This deferral policy has been recognized in repeated court decisions;[7] and since it has

practice charges even though they might have been the subject of an arbitration proceeding and award. Section 10(a) of the Act expressly makes this plain, and the courts have uniformly so held. However, it is equally well established that the Board has considerable discretion to respect an arbitration award and decline to exercise its authority over alleged unfair labor practices if to do so will serve the fundamental aims of the Act.'" (Quoting the Board)

5. *See NLRB v. Pincus Bros., Inc.—Maxwell*, 620 F.2d 367, 379, n. 1 (Garth, J., concurring), (3d Cir. 1980); *Douglas Aircraft Co. v. N. L. R. B.*, 609 F.2d 352, 354 (9th Cir. 1979); *Hawaiian Hauling Service, Ltd. v. NLRB*, 545 F.2d 674, 676 (9th Cir. 1976), *cert. denied*, 431 U.S. 965, 97 S.Ct. 2921, 53 L.Ed.2d 1061 (1977).

6. In this same case, the Court, quoting from what it characterized as "a leading commentator on administrative law," said (460 F.2d at 604):

"If there is to be any measure of predictability and consistency in the process of adjudication, and if the decision maker is not free to rely on unarticulated criteria, then a change in the rule of decision in a given case should apply not only to the case at hand but to similar cases arising in the future. * * *

[A]n inadequately explained departure solely for purposes of a particular case, or the creation of conflicting lines of precedent governing the identical situation, is not to be tolerated."

7. *N. L. R. B. v. Gould, Inc.*, 638 F.2d 159, 165–66 (10th Cir. 1980); *L. 700, Int. Ass'n. Mach. & Aero. Wkrs. v. N. L. R. B.*, 525 F.2d 237, 246 (2d Cir. 1975); *Associated Press v. N. L. R. B.*, 492 F.2d 662, 667, n. 21 (D.C.Cir.1974); *Local U. No. 715, Int. Bro. of Electrical Wkrs. v. N. L. R. B.*, 494 F.2d 1136, 1137–38 (D.C.Cir. 1974). In *Gould*, the Court said (p. 166):

"In the interest of promoting industrial peace and avoiding duplicative litigation, the Board with judicial approval has voluntarily deferred to arbitration awards where the arbitration procedure was 'fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act.' *Spielberg Manufacturing Co.*, 112 N.L.R.B. 1080, 1082 (1955). *See Carey v. Westinghouse Electric Corp.*, 375 U.S. 261, 270–71, 84 S.Ct. 401, 408, 11 L.Ed.2d 320 (1964); *NLRB v. Auburn Rubber Co.*, 384 F.2d 1, 3 (10th Cir. 1976). At least two circuits would add two additional requirements to the *Spielberg* test: (1) that the arbitrator clearly de-

taken no action to interfere with the policy, Congress must be assumed, too, to have given its implicit approval to the policy. Nor, for that matter, has the Board in this proceeding, contended otherwise; its position is simply that the petitioner in this proceeding has not met the specific criteria established for the application of the policy. It thus becomes necessary to determine the circumstances under which the policy of Board deferral is to be exercised in the case of a voluntary settlement of the basic claim. To do this we must first trace the development of the Board's policy.

This deferral policy had its origin in *Spielberg Manufacturing Company*, 112 NLRB 1080 (1955).[8] In that case, the employees, members of a union, engaged in a strike. The strike was settled. However, the employer asserted the right to discharge certain employees for misconduct during the strike, and, in the settlement it was agreed that the propriety of such discharges would be settled by arbitration. Arbitration was had and the arbitrator sustained the discharges. An unfair labor practice charge was then filed with the Board. After a hearing the Board's Trial Examiner ruled that "agreements between private

parties cannot restrict the jurisdiction of the Board . . ., [which] may exercise jurisdiction in any case of an unfair labor practice when in its discretion its interference is necessary to protect the public rights defined in the Act." On the basis of that ruling he refused to defer to the arbitration decision and proceeded to review the discharge and to find such discharges to be violative of the Act. On exception to the Report of the Trial Examiner, the Board reversed. It began its opinion with the caveat that it did "not mean [by its decision] that the Board would necessarily decide the issue of the alleged strike misconduct as the arbitration panel did. We do not pass upon that issue."[9] It then observed that, unlike other cases in which it had refused to defer, "all parties [in this case] had acquiesced in the arbitration proceeding." It concluded by laying down the rule which would govern deferral by the Board in favor of an arbitrator's award: when "the proceedings appear to have been fair and regular, all parties had agreed to be bound, and the decision of the arbitration panel is not clearly repugnant to the purposes and policies of the Act."[10] It justified the rule as one which constitutes

cided the unfair labor practice issue on which the Board is later urged to give deference and (2) that the arbitrator decided only issues within its competence. *See Stephenson v. NLRB*, 550 F.2d 535, 538 (9th Cir. 1977); *Banyard v. NLRB*, 505 F.2d 342, 347 (D.C.Cir. 1974.)"

8. The policy had been earlier foreshadowed in *Consolidated Aircraft Corp. v. N. L. R. B.*, 47 N.L.R.B. 694 (1968), enforced in pertinent part, 141 F.2d 785, (9th Cir. 1944), but generally *Spielberg* has been recognized as the genesis for the general application of the policy.

9. This point that deference is not to be determined by whether the Board agrees with the terms of the arbitration award or the settlement was recognized and upheld in *L. 700, Int. Ass'n. Mach. & Aero. Wkrs. v. N. L. R. B.*, supra, 525 F.2d at 246. *See also, NLRB v. Pincus Bros., Inc.—Maxwell, supra*, 620 F.2d at 374:

"As a result of both judicial and Board deference to arbitration awards, an arbitral result could be sustained which is only arguably correct and which would be decided differently in a trial *de novo*. The national policy in favor of labor arbitration recognizes

that the societal rewards of arbitration outweigh a need for uniformity of result or a correct resolution of the dispute in every case."

10. In *International Harvester Co.*, 138 NLRB 923, 927 (1962), the Board phrased the rule as authorizing deference unless "it clearly appears that the arbitration proceedings were tainted by fraud, collusion, unfairness, or serious procedural irregularities or that the award was clearly repugnant to the purposes and policies of the Act."

Subsequent to *Spielberg*, the Board added a requirement that in the arbitration the arbitrator must have considered and ruled on the central issue in the Labor Board proceedings. *Raytheon Company v. N. L. R. B.*, 140 NLRB 883 (1973), enforcement denied 326 F.2d 471 (1st Cir. 1964). Also, in *Banyard v. N. L. R. B.*, 505 F.2d 342 (D.C.Cir.1974) the Court said deference should not be sustained if the conduct in issue resulting in the contested discharge was a violation of a law designed for the safety of employees. For a somewhat disapproving comment on *Banyard, see*, Note 88 *Harv.L.Rev.* 804, 812 (1975).

"the desirable objective of encouraging the voluntary settlement of labor disputes . . ." and of promoting "industrial peace and stability by encouraging the practice and procedure of collective bargaining" both objectives the Act was designed to achieve.[11] Since it found that the award in this case conformed to the criteria stated by it for deferral, the Board deferred to the arbitration and dismissed the proceeding.[12]

This rule for deference by the Board in favor of arbitration as stated in *Spielberg* was enlarged in *Collyer Insulated Wire*, 192 NLRB 837 (1971). In that case the collective bargaining agreement provided for arbitration of any employee grievance. However, without resort to such provision, a charge of an unfair labor practice under the Act was filed with the Board and was processed with a finding by the Trial Examiner of a Section 8(a)(5) violation. Upon appeal the Board reversed the Trial Examiner and deferred conditionally the proceedings. In so deciding, the Board was confronted not with the problem of deferral to a prior arbitration award but of deferral to an arbitration procedure itself by requiring the union to process its claim under the arbitration machinery established by the collective bargaining agreement. It began by noting that in *Spielberg* "the Board established the now settled rule that it would limit its inquiry, in the presence of an arbitrator's award, to whether the procedures were fair and the results not repugnant to the Act." It added that such policy of the Board "to defer to the arbitration process has never been questioned by the courts of appeals, or by the Supreme Court." The Board, over strong dissents from Members Fanning and

Jenkins, concluded that the reasons which prompted the policy of deferring to an arbitral award applied equally to deference to an arbitration procedure provided in the collective bargaining agreement for the resolution of grievances. But it reserved jurisdiction to await the arbitration proceedings, observing (p. 843):

"This approach, we believe, effectuates the salutary policy announced in *Spielberg*, which the dissenting opinion correctly summarizes as one of not requiring the 'serious machinery of the Board where the record indicates that the parties are in the process of resolving their dispute in a manner sufficient to effectuate the policies of the Act." [13]

And the policy, as stated in *Spielberg*, was specifically extended subsequently to voluntary agreements in 8(a)(1) and (3) discharge cases, such as that involved here, in *Central Cartage Company*, 206 NLRB 337 (1973), the decision on which both the Administrative Law Judge and the Board rested their respective decisions. The Board in that case stated that "the only relevant question" to be resolved in determining a deferral defense claim based on a voluntary settlement "is whether the settlement voluntarily arrived at by the parties covering all the pertinent issues effectuates the policies of the Act." When the settlement meets that test, the settlement is entitled to deference, it being clear that "the parties by their action [in voluntarily settling the issue] have avoided possible time-consuming and costly additional litigation or formal arbitration under their respective collective

---

11. *International Harvester Co., supra*, 138 NLRB 926.

12. For a general statement of the *Spielberg* doctrine, *see* Murphy & Sterlacci, *A Review of the National Labor Relations Board's Deferral Policy*, 42 Fordham L.Rev. 291, 294 (1973):
 "Whatever the potential inconsistencies in the 1947 Act, there emerged in 1955 the *Spielberg* doctrine which has remained firmly entrenched in labor law for almost twenty years. Under *Spielberg*, the Board will defer to the arbitration process when an arbitrator has *already* passed judgment on a labor dispute if (1) the proceedings are fair and regu-

lar; (2) all parties agree to be bound; and (3) the decision is not repugnant to the purposes and policies of the Act. As the *Spielberg* deferral policy became more sharply delineated, the Board indicated that in addition to the criteria set forth above, it would not defer unless it found that the unfair labor practice issue had been presented to and passed on by the arbitrator."

13. For an exhaustive discussion of the decision in *Collyer, see* Murphy & Sterlacci, 42 Fordham L.Rev. at pp. 298–310, as cited *supra*.

bargaining agreements." [14] And, in effect, the Board established the same criteria for determining whether to defer in favor of a voluntary settlement as it had in *Spielberg* for an arbitration award.

*Coca-Cola Bottling Co.*, 243 NLRB No. 89 (1979), a case decided by the Board the same day as this case, is similar to *Central Cartage*. In it the employee had been discharged for allegedly falsifying another employee's record. The discharged employee filed a grievance under his union's collective bargaining agreement with his employer. While arbitration of this grievance was proceeding under the provisions of the collective bargaining agreement, the employee filed a charge with the Board. At this point in the proceeding, the employer, the union and the aggrieved employee signed a settlement agreement of the dispute. Under the policy established in *Spielberg* and *Central Cartage*, the Board dismissed its proceedings, deferring to the voluntary settlement.

As we have said, both the Administrative Law Judge and the Board agreed that the issue of deferral in this case was to be decided on the basis of the criteria stated in *Spielberg* and *Central Cartage*. However, the Administrative Law Judge and a majority of the Board reached contrary conclusions in the application of such policy to the facts of this case. The Administrative Law Judge, after a full hearing with testimony from all the witnesses, found as a fact that the settlement had been duly authorized by Brown, was fair, and was not "contrary to the fundamental purposes of the Act." He accordingly concluded that the proceeding was one for deferral under the Board's settled policy. He ordered the proceedings before the Board dismissed. In reaching this result he relied primarily on *Central Cartage, supra,* saying:

"I do not believe that it comports with the cardinal principle of the Act, i. e., the

encouragement of collective bargaining (which, of course, includes the settlement of disputes through the grievance and arbitration procedures of collective-bargaining contracts), to allow any party to a settlement of a grievance, fairly arrived at, to decide unilaterally that if such party later becomes dissatisfied with the settlement, he may come to the Board with a purpose of upsetting it. As was stated by then Board Member Brown, concurring in *Collyer Insulated Wire, A Gulf and Western Systems Company,* [192 NLRB 837 (1971)]:

"'That the employer and union are bound by their agreement is fundamental to collective bargaining. I also believe that an employee is bound by the acts of his bargaining agent. If an employee could initiate and repudiate the acts of his duly designated representative at his whim, the statutory objective of fostering voluntary settlement by parties to collective-bargaining agreements cannot be attained. This was not intended by Congress and is contrary to the fundamental purposes of the Act. [Id. at p. 845].'"

None of the four opinions of the Board in this case, on the other hand, denied the application of *Spielberg* and *Central Cartage* with their policy of deferral, as governed by certain identified criteria, to the resolution of the issue of deferral in this case, with the possible exception of that of Member Truesdale who in his opinion sought to graft onto the criteria as stated in *Spielberg* an additional one deduced by him from *Coca-Cola, supra.*[15] The plurality opinion of Members Jenkins and Murphy (which is generally treated by the parties as the prevailing opinion, though it is such only with the concurrence of Member Truesdale) first recognized the controlling applicability of *Spielberg* and *Central Cart-*

---

14. 206 N.L.R.B. at 338.

15. The Board has not been constant in its deferral policy but in this case, all the members of the Board conceded and developed their opinions on the assumption that *Spielberg* and *Central Cartage* governed the Board's decision

here. This fact would seem to obviate any necessity for us to engage in any discussion of whether *Spielberg* is still Board policy. *See N. L. R. B. v. Pincus Bros., Inc.—Maxwell, supra,* 620 F.2d at 380–81, n. 4.

*age* and then proceeded to articulate the reasons why, in their opinion, the facts in this case failed to meet the criteria established in the former case:

"In the present case, unlike *Central Cartage*, the record does not disclose whether the legality of Brown's discharge was ever discussed, much less resolved, during the settlement negotiations. Furthermore, in *Central Cartage*, no issue was raised concerning the settlement agreement by any of the parties to the agreement while, in the instant case, Brown has stated and the General Counsel contends that he did not agree that the issue of backpay was resolved by the settlement agreement. There thus appears to be a dispute between the parties concerning the terms and application of their private settlement. In these circumstances, we find *Central Cartage* to be factually distinguishable from the instant case and further find that it would not effectuate the policies of the Act to defer to the settlement agreement herein. Accordingly, we will remand this case to the Administrative Law Judge for a decision on the merits."

Member Truesdale filed a concurring opinion, thereby giving the plurality opinion of Members Jenkins and Murphy the status of the prevailing opinion of the Board. But, unlike those joining in the plurality opinion, he appears to have been troubled (as we agree he should have been) by the obvious inconsistency in result between the decision in this case and in that of *Coca-Cola*, decided on the same day and involving, as does this case, the issue of deferral in favor of a voluntary settlement. The settlement in *Coca-Cola* had occurred in the midst of the Labor Board proceedings and the parties, in the settlement agreement, provided for the abandonment of the Labor Board charge by the complaining employee. Member Truesdale found in this fact a justification for joining in the plurality opinion:

"The *Coca-Cola* decision, however, injects a new factor for consideration [in determining whether to defer to a voluntary settlement]: whether the employee

has clearly and knowingly waived his right to process his particular complaint before the Board. Under *Coca-Cola*, that waiver must be voluntary and unequivocal. In the absence of substantial evidence of such a waiver in the instant case, I join the majority in refusing to defer to the settlement agreement."

The dissent of Chairman Fanning, on the other hand, found deferral proper in this case, stating:

"I believe that these circumstances [i. e. those in this case] warrant deferral, perhaps more so than in the typical *Spielberg* situation, in which the parties had agreed on a dispute resolution procedure, but not on the result."

He also emphasized that "Brown specifically authorized a union official to settle his grievance and returned to work after being informed of the settlement, and the facts warrant the conclusion that he was fully aware of its provisions."

Member Penello, also dissenting, reached the same conclusion, summarizing his views in this sentence: "I believe that the *Spielberg* tests for deferral apply to grievance settlements as well as arbitration awards, and applying those tests here find deferral appropriate."

 Analyzing the prevailing opinions, it seems clear that the majority stated at most but three grounds for finding that the voluntary settlement in this case failed to satisfy the criteria established for the application of the Board's deferral policy. Two of those grounds, set forth in the plurality opinion, involve questions of fact; the third represents a new criterion as set forth in the concurring opinion of Member Truesdale. We address first the latter reason, as embraced in the concurring opinion of Member Truesdale. As we have noted, the Truesdale concurring opinion discovered in *Coca-Cola* a new criterion which he concluded must be met in determining whether the Board will defer in favor of a voluntary settlement; i. e., the settlement must include a specific waiver of the right to process a Labor Board charge. There are, how-

ever, two conclusive objections to the use of such criterion in this case. First, this new criterion carries the imprimatur of only one member of the Board and thus cannot be regarded as an essential requirement for the application of the Board's deferral policy. Secondly, the basis for the new criterion stated in *Coca-Cola* is completely inapplicable here. In this case the voluntary settlement was not only executed but also was fully and freely acted upon by both parties months before any Board charge was considered or filed. As we have seen, Chairman Fanning in his opinion recognized this. He said that "[d]ifferent considerations would be involved had a charge been filed [with the Board] before the settlement." Actually, Chairman Fanning has expressed reservations about deferral in any case where the voluntary settlement or arbitration takes place *after* Board proceedings have begun.[16] In short, if there were in process proceedings before the Board on the grievance, a voluntary settlement of the grievance between the employer and complaining employee, in the absence of an agreement that the Board's proceedings would be waived, might well not abort the Board proceedings. But that reason would have no application if the voluntary settlement were effectuated when no charge before the Board was pending or reasonably to be anticipated. In that case there would be no occasion to insert in the settlement agreement a specific provision abandoning an on-going Board proceeding. And that was the situation in this case as contrasted with that in *Coca-Cola*. Accordingly, even if the novel criterion for deferral found by Member Truesdale in *Coca-Cola* were to be considered Board policy (on the basis only of Member Truesdale's finding), that criterion would not be applicable here. That conclusion means that the only basis for denial of deferral in this case must be found in the two reasons phrased in the plurality opinion. And since these reasons are in both instances based on factual findings, the issue is whether these reasons find substantial support in the record.[17] If they do not, they provide no authority in the Board to depart from its settled policy of deferral. We accordingly turn to the two reasons for non-deferral stated in the plurality opinion.

The first reason given in the plurality opinion for non-deferral was that "the legality of Brown's discharge was [never] discussed, much less resolved, during the settlement negotiations," and the second is that Brown never agreed to, or authorized his agent to agree, to the abandonment of a claim for backpay.

■ We recognize that deferral under *Spielberg* will not be appropriate if the merits of the claim which are the subject-matter of the settlement and of the Labor Board proceedings were never discussed or considered in the settlement negotiations.[18] This was the reason given for refusal by the Board to defer in *Sabine Towing & Transportation Co.*, 224 NLRB 941 (1976) (the legality of the discharge "was never raised, much less resolved during the settlement

---

16. *See N. L. R. B. v. Pincus Bros., Inc.—Maxwell, supra*, 620 F.2d at 384, (Gibbons, J., dissenting).

17. We believe that since the reasons given by the Board's majority for finding that the facts in this case do not satisfy the established criteria for deferral were purely factual, the standard for review should be the one commonly used in reviewing Board decisions, i. e., is it supported by substantial evidence?

It is true that in *N. L. R. B. v. Pincus Bros., Inc.—Maxwell, supra*, the Court split three ways on the standard of review. The prevailing opinion seems to have opted for abuse of discretion as the proper standard for review. But, in explication of this standard, the majority said that it was an abuse of discretion to refuse to defer to an arbitration award "where the findings of the arbitrator" may be "only arguably correct." 620 F.2d at 374. This seems to be a less exacting standard than the one we apply here. But even if abuse of discretion is the standard, a decision of the Board based on factual findings without any credible support in the record would be an abuse of discretion. So far as this case is concerned, the issue of a factual support for the essential findings is dispositive whether we apply an abuse of discretion standard or not.

18. This, of course, does not mean that the settlement had to be correct in the Board's opinion. *N. L. R. B. v. Pincus Bros., Inc.—Maxwell, supra*, 620 F.2d at 374 and *Associated Press v. N. L. R. B., supra*, 492 F.2d at 667.

negotiations"), and in *Owens Corning Fiberglas Co.*, 236 NLRB No. 32 (1978). It, also, was the point on which the Court sustained non-deferral in *N. L. R. B. v. Gould, Inc., supra*, 638 F.2d 159. The difficulty with this reason in the instant case, however, is not only that it is without support in the record but, more importantly, the record completely refutes the claim. The propriety of the discharge had been a matter "discussed" between the union, as Brown's representative, and the petitioner almost from the date of Brown's discharge. It was an issue that had been submitted to arbitration under the union agreement. There had been a full hearing on the issue before an arbitration panel. It was in the light of all this that negotiations for a settlement were begun with the full approval and authorization of Brown. We perceive no factual basis whatsoever for the Board's finding that the settlement was effected without any consideration of the validity of Brown's discharge.

■ The second ground given by the Board's majority for refusal to defer is the failure of Brown to agree to the settlement. This is again a good basis for refusal to defer—provided the record sustains the claim. This was the situation in *T & T Industries, Inc.*, 235 NLRB 517 (1978) (Jagodzinski, the complainant, never agreed to the settlement and from the beginning refused to abide by it); *see also, American Cyanimid Co.*, 239 NLRB 440 (1978) and *Ford Motor Company*, 233 NLRB 698 (1977) (in both of which the issue was whether the union could settle the employee's claim without his knowledge or agreement). There is no substantial evidence to support such a finding in this case. The Administrative Law Judge found categorically that Brown was told by Blevins of the proposed settlement which included the no-backpay provision *before* the settlement was agreed to. That finding must be considered by this Court "in assessing the substantiality of the support for the Board's findings." *N. L. R. B. v. Donald E. Hernly, Inc.*, 613 F.2d 457, 462 (1980).[19] And, Blevins immediately after the settlement was agreed upon, wrote a letter to both Brown and the employer stating in the clearest language the terms of the agreed settlement and particularly its no-backpay provision. Brown made only one request in connection with the settlement as it was first presented to him by Blevins and that related to the date he was to report to work. The requested change was agreed to, "in apparent full agreement with its provisions" (to quote the Administrative Law Judge). It was not until "4 months later [that] he apparently became dissatisfied with his bargain and decided to file a charge before the National Labor Relations Board."[20] Brown did not deny at the hearing that he had authorized the union representative Blevins to negotiate a settlement of his grievance with his employer.[21] Contrary to Blevins' positive testimony that after the proposed settlement was agreed to he had told Brown of the terms of the settlement, including the no-backpay provision in the settlement agreement, Brown is hopelessly indefinite in his testimony on whether Blevins advised him of the no-backpay provision in the settlement agreement. His actual answer to the question was that Blevins so told him, "[m]ore or less, yes." That hardly qualifies

---

**19.** In *Hernly*, the Court said:

"Nevertheless, the findings of the ALJ are a part of the record that must be considered by the reviewing court in assessing the substantiality of the support for the Board's findings. This is especially true where the findings hinge principally on questions of the credibility of the witnesses."

**20.** This is the finding of the Administrative Law Judge.

**21.** *See Suissa v. American Export Lines, Inc.*, 507 F.2d 1343, 1347 (2d Cir. 1974); *Griess v.*

*Climax Molybdenum Co.*, 488 F.Supp. 484, 487 (D.Colo.1980).

In *Suissa* the Court said:

"Quite different considerations prevail, however, once the remedy provided by the collective bargaining agreement has been pursued. *Ordinarily, in such circumstances, settlement of a grievance by the union and the employer is binding upon the individual employee, absent evidence that the union has acted in bad faith in carrying out its duty of full and fair representation* (Italics added)."

as a refutation of Blevins' positive testimony and unquestionably was not enough to create an issue of fact between Blevins and Brown on whether Blevins told Brown before he went back to work that he (Brown) was not to receive any backpay, or to support a reversal of the Administrative Law Judge's finding of fact, based as it was on the observation of the parties. Moreover, it is important that, until he filed his Labor Board charge, Brown never claimed that he was entitled to backpay under the settlement.

It seems actually to be the Board's position on appeal, as set forth in its brief, not that Brown had not agreed to the settlement but that whether Brown "approved the settlement terms [or not] is irrelevant. The Act is intended to protect the economically weak, and it would subvert this purpose to deprive Brown of the Act's protection simply because he implicitly accepted a settlement in order to return to work rather than to continue to suffer the economic deprivations of unemployment." It seems fair to assume that when the Board chooses to argue that the question whether Brown agreed to the settlement was "irrelevant," it does so because it recognizes that the record will not support any claim that Brown failed to agree to the settlement before he returned to work. And we agree that the record gives no support to the argument that Brown did not know or approve of the settlement before he returned to work. Moreover, it must not be overlooked that for over four months Brown, *without complaint,* acquiesced in the settlement.

It should be remembered that there is no evidence in this record of any anti-union animus on the part of the employer or any action on its part "repugnant to the terms of the Act." The record indicates quite plainly that the relations between the employer and the union were amicable and cooperative. Thus, when the unauthorized strike began the employer turned to the union in working out a resolution of the problem posed by the strike. This fact, it would seem, manifests an acceptance by the employer of the policy of following the provisions of collective bargaining in resolving problems with its employees. Such conduct accords with the federal labor policy as it has been consistently defined. This was a circumstance considered by the Board itself in *Collyer* in determining whether an arbitration award was to be accorded deference by the Board. *See Local Union No. 2188, Int. Bro. of Elec. Wkrs. v. N. L. R. B.,* 494 F.2d 1087, 1090 (D.C.Cir.1974), *cert. denied,* 419 U.S. 835, 95 S.Ct. 61, 42 L.Ed.2d 61. This circumstance was not noted by the Board in its decision in this case but it is an undisputed fact that does suggest powerfully that deferring to the settlement in this case, effected by the union's representative acting with the full approval of Brown, would not be repugnant to the national labor policy of respecting agreements freely made between an employee and employer, where such agreement had been effected under the protection of the employee's bargaining agent, as was the situation here. That certainly is promoting the use of the collective bargaining agent in resolving peaceably and amicably grievances and this is one of the primary purposes of the National Labor Relations Act.

 We conclude that the reasons given by the majority of the Board for reversing the Administrative Law Judge and for refusing to defer to the voluntary settlement by the parties are without substantial support in the record and are insufficient to authorize the Board in this case to depart from its policy of deferring under certain established circumstances to voluntary settlements.[22] It is unnecessary, therefore, for us to consider the order of the Board on the merits of the charge.

*ENFORCEMENT DENIED.*

**22.** In both *NLRB v. Pincus Bros., Inc.—Maxwell, supra,* 620 F.2d 367, and *Douglas Aircraft Co. v. N. L. R. B., supra,* 609 F.2d 352, the

Court refused to enforce because the Board had failed to defer to an arbitration award.